**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1101-22

K.O.,[1]

      Plaintiff-Respondent/
      Cross-Appellant,

v.

F.O.,

      Defendant-Appellant/
      Cross-Respondent.

_____

      Submitted November 6, 2024 – Decided November 14, 2024

      Before Judges Firko and Augostini.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FM-12-1438-21.

      George G. Gussis, PA, attorneys for appellant/cross-respondent (George G. Gussis, on the briefs).

---

[1] To safeguard their privacy, we refer to the parties and their minor children by their initials. R. 1:38-3(d).

Rozin Golinder Law, LLC, attorneys for respondent/cross-appellant (Edward A. Wojciechowski, of counsel and on the briefs).

PER CURIAM

Defendant F.O. appeals from the November 1, 2022 dual judgment of divorce (DJOD) entered in this action involving his ex-wife, plaintiff K.O., following a six-day trial. Defendant argues the Family Part judge erred by: (1) giving plaintiff the first opportunity to purchase the former marital home; (2) equitably distributing 383 Sandford Street in New Brunswick, which was a pre-marital asset, and no marital funds were used to maintain it; (3) equitably distributing a vacant lot on Lee Avenue in New Brunswick, which was originally purchased by his mother, and repurchased by defendant using his mother's money; (4) not granting the parties equal residential custody and parenting time; (5) awarding plaintiff alimony as she was voluntarily underemployed; (6) failing to comply with Rule 5:8-6 in determining custody and parenting time; (7) awarding alimony and not entering an order pendente lite as to how household expenses were to be paid; and (8) awarding plaintiff child support in the amount of $141.00 per week after erroneously adopting plaintiff's parenting time plan.

On cross-appeal, plaintiff argues the judge erred: (1) in utilizing an annual income of $110,000.00 for defendant when calculating alimony because his

income is substantially higher; and (2) in holding both parties responsible for payment of their own counsel fees as defendant acted in bad faith, and the <u>Rule</u> 5:3-5(c) factors weigh in plaintiff's favor.

Following our review of the record and applicable law, we reject defendant's arguments on equitable distribution and custody and parenting time. However, as to plaintiff's cross-appeal, because the judge undervalued defendant's income, we reverse the alimony award and remand for a new analysis, which shall include defendant's actual earned and unearned income. The child support award is reversed because the judge utilized an erroneous alimony award in the child support calculation. Based on the revised alimony and child support awards on remand, the judge shall consider anew the counsel fee decision.

I.

A.

Factual Background

The parties married in August 1999. They have four children: S.O., born in May 2000; K.O., born in July 2002; M.O., born in May 2005; and Ka.O., born in 2010. Only two of the children—M.O. and Ka.O.—were minors at the time of divorce. During the marriage, plaintiff worked as a special education teacher

3

and from 2011 to 2013 worked as a supervisor of special education, which required her to work longer hours and paid her a higher salary. As a teacher, plaintiff earned $95,853.00 per year. Defendant became a firefighter shortly after the parties married. In 2020, defendant earned $125,417.20, and in 2021, he earned $133,000.00.

B.

Real Property

In 1997, defendant and his parents purchased a two-family rental property at 383 Sandford Street. That same year, defendant purchased the property from his parents for $110,000.00, although he claimed it was worth $200,000.00. Plaintiff believed that defendant did not actually pay his parents any money for the property but they transferred title to him. Defendant testified that he refurbished the property while living in one of the apartments and, after moving out, rented both apartments and collected the rent.

After three years of dating, plaintiff and defendant got engaged in 1998 and lived together in an apartment in Somerset. Shortly after their engagement, they purchased a three-family rental property at 221 Howard Street for $195,000.00 from defendant's parents. The deed listed both parties as owners. They moved into one of the apartments and rented the other two units.

4

Defendant testified that his parents had moved to the United States from Kenya and that his mother had hoped to develop a successful real estate business with him and plaintiff. Defendant's mother funded their real estate purchases until she passed away in 2020. Defendant said that whenever he needed money, he went to his mother; "she was like the bank." In December 2001, plaintiff and defendant purchased their marital home in Spotswood for $245,000.00 and moved into the house from the Howard Street apartment.

Also in 2001, plaintiff testified she and defendant obtained a mortgage on the Sandford Street property because the property was not self-sufficient, and the tenants did not always pay the rent. To compensate, defendant used marital funds to pay the mortgage. The "entire apartment" was also refurbished at one point. Plaintiff testified that funds to make those improvements were "taken from here or there." At times, it was "like a shell game" with funds coming from rental income of other apartments or from "some other place."

Plaintiff testified that Howard Street was also not self-sufficient and required updating. When there were shortfalls, marital funds were used to pay for them. Plaintiff testified the parties' plan for the rental properties was to pay off the mortgages and then use the rental income to fund their children's college

5

education. That plan did not come to fruition, however, because the rental income was not enough to support the properties.

Defendant conceded that the tenants did not always pay the rent, but he insisted the mortgages were always paid and that the total rents exceeded the mortgage payment. Defendant denied that he used joint funds to support the apartments. He claimed he used his own funds to refurbish the apartments and did most of the work himself. He also claimed that he used rental income to make repairs and update the apartments.

In 2004, plaintiff, defendant, and his mother bought a vacant lot at 184-186 Redmond Street, intending to build a duplex on it, and then sell the duplex for a profit. Plaintiff testified all three names were on the deed. Defendant testified the purchase price was $143,000.00, and his mother provided the funds to buy it. He secured a construction loan to build the duplex. Defendant had the property subdivided and constructed two buildings with the help of friends and subcontractors, then sold each for $310,000.00. Plaintiff stated this was a successful venture because the parties were able to construct the duplex and sell it in 2005 for a profit. Plaintiff testified she hoped to continue this type of real estate venture, as opposed to owning rental properties, which she felt were not profitable.

A-1101-22

Plaintiff testified that in December 2005, she, defendant, and his mother used the profit that they received from the sale of the Redmond Street property to buy two vacant lots: 188 Townsend Street for a purchase price of $170,000.00, and 96 Lee Avenue for a purchase price of $320,000.00.

Defendant was named as the sole owner on the Lee Avenue deed, and plaintiff testified she did not know why because she, defendant, and his mother contributed to the purchase price. In 2006, defendant transferred title from Lee Avenue to Silver City Services LLC, a limited liability company that he and his mother had created to protect the family's real estate assets.[2]

Defendant claimed that his mother gave him the money to purchase Lee Avenue. He rented it as a parking lot for commercial trucks. Defendant had planned to construct a duplex on Lee Avenue, which he had estimated would cost $1.2 million, but that never occurred. Defendant claimed that his mother had been responsible for paying the taxes for Lee Avenue, and she had failed to do so. Ultimately, he lost the property at a tax sale, but in 2018, his mother loaned him $48,500.00 to repurchase the lot—by paying the delinquent taxes—

---

[2] Defendant created another company, Merchantville Co-op LLC, also to protect family assets. Both companies used the marital home's address as their business addresses.

A-1101-22

and he has owned it ever since. Plaintiff did not dispute these facts or defendant's testimony on this issue.

With respect to Townsend Street, all three were named as owners on the deed. Plaintiff said they intended to build a duplex on Townsend Street and sell it for profit, much like Redmond Street. Defendant explained that he and plaintiff had secured a $600,000.00 mortgage secured by all their properties so that he could construct a handicap accessible "group home for eight clients and [twelve] staff members." During construction, "the money ran out," and defendant could not complete the home.

Defendant testified he tried to obtain a mortgage to cover the $1.2 million that Lee Avenue would cost and have $300,000.00 left to complete Townsend, but he ultimately failed in securing the loan. Instead, he used money from his paychecks to fund the project. Plaintiff said that without her knowledge, defendant had used funds intended for the Spotswood marital home mortgage to try to keep the Townsend property. Defendant conceded that he was not paying the marital home mortgage at this time, but was using those funds for Townsend Street.

The mortgage on both properties went into foreclosure. Defendant said he applied for a mortgage to complete Townsend Street, but the application was

8

not approved.  He also transferred Townsend Street to Silver City Servicing and then filed a petition in bankruptcy for the company, hoping to buy enough time to finish Townsend Street and sell it.  However, Townsend Street was not finished and was lost in foreclosure.

To save the marital home, plaintiff testified the parties "bundled everything together" into one mortgage, but they lost Townsend Street in foreclosure.  She referenced a November 2013 $600,000.00 mortgage from Summit Capital Partners LLC to plaintiff, defendant, and Silver City Services LLC, which listed Sandford Street, Howard Street, and Lee Avenue as collateral. Plaintiff testified there was equity in Howard Street and Sandford Street, which the parties used as collateral for the new mortgage to keep the marital home. According to plaintiff, the parties "had to get a loan outside of a bank" because two mortgages were in default, and the "regular bank" would not give them a mortgage.

Defendant testified that plaintiff told him she "didn't want any part of the responsibility on any of the houses," and removed herself from the loans. Defendant testified that he refinanced the loans so that he alone was named as the borrower.  Plaintiff disputed this.

A-1101-22

Defendant further testified he obtained a loan on the Spotswood marital home, which he called a "second mortgage," to purchase solar panels for that home and claimed he solely made the monthly payments for the solar panels. Plaintiff testified she was not aware of a second mortgage on the marital home but was aware that defendant had purchased solar panels for the home, and he paid the bill.

Plaintiff claimed that defendant collected the rents from their properties but did not share the amount of rents collected or the expenses for the properties. She did not know where the money came from to support the properties and defendant refused to tell her. Plaintiff thought, however, that the rental income was not enough to maintain the properties, and she "kept begging [defendant]" to sell them. Plaintiff stated the marital home needed repairs, but the parties could not afford to do them. Plaintiff said the mortgage on the marital home was delinquent at one point because defendant used marital funds to support the rental properties. Plaintiff claimed defendant never showed her any documents that recorded where their money came from and where it went. Defendant countered that plaintiff "stole" the real estate paperwork.

A-1101-22

C.

Marital Expenses and Lifestyle

Throughout their relationship, plaintiff testified the parties divided their expenses and paid them with joint funds. She claimed that defendant did not share information on the rental income and expenses, which he paid from a checking account she had no access to. Initially, plaintiff stated that the parties divided expenses until seven years ago, when she realized defendant earned more money. Thereafter, plaintiff calculated the difference in their pay and apportioned the parties' expenses in accordance with that ratio.

Plaintiff explained that, while her salary did not directly support the rental properties, it indirectly did when rental incomes were insufficient, and defendant used marital funds to support the properties. Plaintiff testified defendant refused to tell her what the source of the funds was. The parties' tax returns for 2017 to 2020 indicated that the rental properties operated at a loss.

With respect to lifestyle, plaintiff described it as "middle class." Plaintiff testified the family took one or two vacations each year and described the restaurants they frequented and stores they shopped at. With respect to their incomes, plaintiff reported on her case information statement (CIS) dated May 2, 2022, that her gross yearly income was $95,853.00 and her net income was

11

$76,140.00, making her weekly gross income $1,849.00 and net income $989.00. The monthly mortgages for the real properties were: $2,657.00 (Spotswood, balance of $179,625.00), $4,385.00 (Howard Street, balance of $391,437.00), and $1,300.00 (Lee Avenue, balance unknown). The parties also had home-related monthly expenses that totaled $1,420.00.

Plaintiff claimed that she and defendant were equally responsible for the mortgages. However, she reported on her CIS that her current lifestyle expenses included $2,581.00 for the Howard Street mortgage, nothing for Lee Avenue, and the full amount of the Spotswood mortgage. She reported that the Schedule A shelter expenses for the joint lifestyle totaled $9,762.00, while her current Schedule A expenses totaled $6,815.00. Plaintiff estimated the following values for the real estate: $460,000.00 (Spotswood); $365,500.00 (Sandford Street); $575,000.00 (Howard Street); and $315,000.00 (Lee Avenue).

With respect to Schedule B transportation expenses, plaintiff reported that they were nearly the same for both lifestyles ($1,260.00 joint and $1,182.00 for current). Plaintiff's Schedule C personal expenses were also essentially the same under both lifestyles ($3,993.00 joint and $4,044.00 current).

Plaintiff reported that her savings and checking accounts were valued at roughly $1,450.00, and she maintained a college fund for the children that had

A-1101-22

been depleted. In addition to their vehicles, the parties owned a 1995 boat and five dirt bikes, the values of which were unknown to plaintiff. In items of assets, plaintiff owned: a retirement savings account valued at $256,120.00; a pension valued at $792,880.00; and a life insurance policy with a cash-out value of $26,906.00. Plaintiff had $21,019.00 in liabilities primarily resulting from loans from a friend and against her retirement account, for which she paid a total of $532.00 per month. Plaintiff estimated the parties' total gross assets subject to equitable distribution were $2,876,284.00, with a net value of $2,284,203.00.

Defendant reported on his April 25, 2022 CIS, gross income of $111,486.00 and net income of $89,273.00 ($2,416.00 gross weekly and $1,100.00 net weekly). He reported no current expenses and reported only the mortgage for the marital home for the joint lifestyle ($2,658.00). He claimed that monthly Schedule A expenses were $3,894.00. He reported $450.00 in Schedule B expenses and $1,189.00 in Schedule C expenses. Defendant testified that he only reported expenses that he paid for the family.

Defendant reported the same estimated real estate values as plaintiff, except he wrote "TBD" for Lee Avenue. Defendant claimed his bank accounts totaled $86,647.00; his pension was valued at $1,405,634.00; his annuity was valued at $273,887.00; and his Individual Retirement Account (IRA) was valued

13

at $200,300.00. He listed the mortgage balances as follows: $164,022.00 (Spotswood first mortgage); $405,839.00 (Howard Street); $40,536.00 (Spotswood mortgage for solar panels); and $98,205.00 (Sandford Street, monthly payment of $1,239.00).

Defendant also claimed he owed his mother's estate the sum that she had lent him to buy back Lee Avenue. He also stated he owed $48,825.00 for windows and credit card debt (monthly payments totaling $451.00). He listed his net worth as $3,472,507.00, and the total subject to equitable distribution as $757,437.00. Defendant conceded that Spotswood and Howard Street were marital properties but disputed that Sandford Street and Lee Avenue were subject to equitable distribution.

D.

Custody and Parenting Time Disputes

Plaintiff testified that she was previously responsible for making breakfast for the two minor children, disciplining them, helping them with homework, getting them ready for bed, grocery shopping, and doing household chores. During summers, when she did not teach, plaintiff stated she spent most of her time caring for the children and defendant devoted extra time to maintaining and refurbishing the rental properties.

14

Defendant drove the minor children to school, took them to doctor appointments, made dinner for the family, and helped with laundry. As a firefighter, he worked one twenty-four-hour shift followed by three days off. M.O. and Ka.O. participated in various sports and extracurricular activities.

E.

The Divorce Trial

Trial lasted six nonconsecutive days. The judge also interviewed the two minor children. Both parties were represented by counsel. Plaintiff and defendant were the only witnesses who testified.

F.

The Judge's Decision

After trial, on November 1, 2022, the judge issued a nineteen-page written decision, which was incorporated into the DJOD. The DJOD provides in essence:

> (1) The parties' equity in the former marital home in Spotswood was to be equally divided after plaintiff acquired defendant's interest "by offsetting" the appropriate amount of equity she has in the other properties.

15

(2) The three rental properties, 221 Howard Street, 383 Sandford Street, and 96 Lee Avenue were to be listed for sale. Defendant was permitted to purchase the properties with the equity being equally distributed. The judge ordered defendant to be solely responsible for the $100,000.00 mortgage he acquired on the Sanford Street property. The mortgage encumbering the 96 Lee Avenue property was to be paid out of the proceeds of the sale of that property.

(3) The judge equally divided the vehicles, personal property, and retirement accounts.

(4) Each party was responsible to pay their own credit card debt.

(5) Defendant was ordered to pay $500.00 per month in open durational alimony to plaintiff.

(6) The parties were awarded joint custody of M.O. and Ka.O., with plaintiff designated as the parent of

16

primary residence (PPR) for purposes of the children's schooling.

(7) Each party was responsible for their own counsel fees and costs incurred in the litigation.

On November 3, 2022, the judge entered a supplemental order and decision awarding plaintiff $141.00 per week in child support. The judge ordered plaintiff to maintain medical insurance coverage for the children, and any unreimbursed healthcare and dental expenses for the children would be paid 50% by each party after plaintiff paid the first $250.00 per child per year of unreimbursed expenses.

The judge ordered all extracurricular and college expenses incurred on behalf of the children to be equally divided by the parties. Both parties were ordered to maintain their existing life insurance policies until the children are emancipated. The judge also ordered how the parties would declare the minor children as deductions for income tax purposes until each was emancipated. The judge attached a child support worksheet to his opinion. This appeal followed.

On appeal, defendant argues broadly that the judge's decision was an abuse of discretion because every discretionary decision was made to his detriment. Specifically, he asserts error in giving plaintiff the first opportunity

to purchase the former marital home, and ordering 383 Sandford Street and 96 Lee Avenue subject to equitable distribution. Defendant argues the judge abused his discretion in not granting the parties equal residential custody and equal parenting time.

Defendant also contends the judge erred in awarding plaintiff alimony as she was voluntarily underemployed and not ordering how the parties' household expenses were to be paid pendente lite. Defendant also asserts the judge failed to comply with Rule 5:8-6, and in awarding plaintiff $141.00 per week in child support after "erroneously" adopting her parenting plan.

In her cross-appeal, plaintiff contends the judge erred in utilizing an annual income of $110,000.00 for defendant when calculating alimony because his income is substantially higher, and in holding both parties responsible for their own counsel fees and costs as defendant acted in "bad faith," and the Rule 5:3-5(c) factors weigh in her favor.

II.

A.

Equitable Distribution

Defendant argues the judge abused his discretion in equitably distributing the former marital home in Spotswood, 383 Sandford Street, and the Lee Avenue

A-1101-22

properties. Defendant contends that he should have been awarded the former marital home because he alone was responsible for the mortgage. He also claims 383 Sandford Street and the Lee Avenue properties were his separate properties not subject to equitable distribution.

Marriage is a shared enterprise and, as a result, when a marriage is dissolved, the assets should be fairly divided by the parties. Rothman v. Rothman, 65 N.J. 219, 229 (1974). The judge conducts a three-part analysis when distributing a marital asset. Id. at 232. First, the judge decides what property is eligible for distribution, then determines the value of the property, and finally decides how much to equitably allocate to the parties. Ibid. Importantly, the term "equitable" does not necessitate that the parties receive equal shares, but rather the judge provides the parties with a fair division achieved by applying a series of factors set forth in N.J.S.A. 2A:34-23.1. See Carr v. Carr, 120 N.J. 336, 348 (1990). These factors include:

> (a) The duration of the marriage or civil union;
>
> (b) The age and physical and emotional health of the parties;
>
> (c) The income or property brought to the marriage or civil union by each party;
>
> (d) The standard of living established during the marriage or civil union;

(e) Any written agreement made by the parties before or during the marriage or civil union concerning an arrangement of property distribution;

(f) The economic circumstances of each party at the time the division of property becomes effective;

(g) The income and earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children, and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage or civil union;

(h) The contribution by each party to the education, training or earning power of the other;

(i) The contribution by each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount or value of the marital property, or the property acquired during the civil union as well as the contribution of a party as a homemaker;

(j) The tax consequences of the proposed distribution to each party;

(k) The present value of the property;

(l) The need of a parent who has physical custody of a child to own or occupy the marital residence or residence shared by the partners in a civil union couple and to use or own the household effects;

(m) The debts and liabilities of the parties;

(n) The need for creation, now or in the future, of a trust fund to secure reasonably foreseeable medical or educational costs for a spouse, partner in a civil union couple or children;

(o) The extent to which a party deferred achieving their career goals; and

(p) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23.1.]

Furthermore, the judge does not simply mechanically divide the marital assets, but weighs the unique circumstances of each case. If a party contends that an asset is immune from equitable distribution, the burden of proof lies with the challenging party. Landwehr v. Landwehr, 111 N.J. 491, 504 (1988).

When the parties appeal the designation of assets subject to equitable distribution and valuation, the standard of review is whether the judge's decision was supported by sufficient credible evidence in the record. Rothman, 65 N.J. at 233. When the parties appeal the amount of the equitable distribution award or the manner of allocation, a reviewing court applies an abuse of discretion standard. Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443-44 (App. Div. 1978).

In making an equitable distribution of marital property, a judge must consider whether a party has dissipated an asset. Kothari v. Kothari, 255 N.J. Super. 500, 506 (App. Div. 1992). While the Legislature did not define dissipation, "the concept is a plastic one, suited to fit the demands of the individual case." Ibid. Generally, dissipation may be found where a spouse uses marital property for their own benefit, with the intent of diminishing the other spouse's share of the marital estate, at a time when the marriage relationship was in serious jeopardy. Id. at 506-07.

Here, the judge expressly considered each of the statutory factors. To avoid repetition, we need only discuss the findings on the pertinent facts.

The judge found that the marriage had lasted twenty-three years, the parties were both fifty-four years old, and in good health.

With respect to property brought into the marriage, the judge noted that defendant purchased 383 Sandford Street and 221 Howard Street in 1997, two years before the marriage, and had added plaintiff's name to the 221 Howard Street property in contemplation of marriage. The 221 Howard Street rental had three apartments, and the parties lived in one of them for the first five years of their marriage.

The judge determined the parties used their rental income and salaries to maintain their middle-class lifestyle and did not spend beyond their means. The parties did not have a written agreement regarding distribution of property.

The judge found that plaintiff's yearly income as a special education teacher was $95,853.00, and defendant's income as a fireman was $110,000.00. Defendant also received income from the rental properties, but he did not disclose the amounts. Both parties were "earning incomes commensurate with their education and training" and neither needed additional training or education.

Regarding each party's contribution to the other's earning power, the factor was not applicable. With respect to the contributions each made to their property, the judge found that defendant maintained the rental properties, with plaintiff's occasional assistance. Each party would be responsible for the tax consequences of the equitable distribution award.

The record shows neither party provided information on the value of the properties they owned. Moreover, the judge found that plaintiff had a greater need to remain in the former marital home with the children, noting that defendant obtained a $100,000.00 loan hoping to purchase a nearby home, which showed that he "tacitly had no opposition to" plaintiff's remaining in the former

marital home. With respect to marital debt, the parties had agreed to distribute it and that issue is not challenged on appeal.

The need for a trust or education fund was not applicable here, however, the judge noted that plaintiff had an educational fund for the children, which she would continue to maintain.

Neither party deferred career goals during the marriage. With respect to "other relevant circumstances" factor, the judge concluded that defendant had control over the real properties and decided financial matters for the properties, noting "[p]laintiff was kept in the dark on those matters." Although defendant claimed his mother provided financial support, the judge found he failed to provide any supporting proof.

The judge awarded plaintiff the former marital home and required her to use her share of equity in the rental properties to pay defendant his 50% share. As stated, the judge required the parties to list the Howard Street property for sale and to share in the proceeds.

The judge found that defendant had failed to meet his burden of proving that the remaining two rentals—Sandford Street and Lee Avenue—were his separate property not subject to equitable distribution. The judge recognized that defendant purchased Sandford Street two years prior to the marriage but

24

underscored that the parties' 2017 to 2020 joint income tax returns listed all of the rental properties as operating at a loss all four years. The judge reasoned this showed that "other marital mon[ies] were needed to supplement the rental income to maintain the property." Further, the parties used equity in both properties to purchase the marital home and to refinance it. The record supports the judge's determination.

The judge held that both properties were to be sold with the parties sharing in the proceeds and defendant being responsible for the $100,000.00 mortgage that he alone obtained on Sanford Street to purchase a home, which never occurred. The parties were to repay the $48,500.00 to defendant's mother's estate, the proceeds of which were used to pay the delinquent taxes on Lee Avenue and regain ownership of the lot.

With respect to all three rental properties, the judge permitted defendant to purchase the properties, as he had expressed a desire to retain all of them. The judge further ordered the parties to retain their respective vehicles and bank accounts and to pay the credit cards in their own names.

Plaintiff's pension (valued at $792,879.55 for the coverture period) and defendant's pension (valued at $1,405,634.35 for the coverture period) were to be equally divided. Plaintiff also had a $255,501.42 retirement plan, from which

25

she had obtained a $12,000.00 loan to pay for counsel fees. The judge denied her request to reduce the value of the plan by the loan amount. Defendant also had an annuity account valued at $178,034.02, which the judge ordered the parties to divide equally as of the value at the time of the complaint. Defendant also had a rollover IRA valued at $128,640.00 that the judge found was his separate property, acquired prior to marriage, and supplemented with inheritance monies from his late mother.

## B.

## The Former Marital Home

The judge rejected defendant's request to remain in the former marital home and that he "alone" was responsible for paying the mortgage on the Spotswood property. The judge found defendant's proofs on this issue were inadequate.

Defendant included a document evidencing a November 2016 mortgage to both him and plaintiff with the Spotswood home as collateral, which supports both parties being liable for that mortgage. Defendant also produced a March 2021 Quicken Loans billing statement addressed to him only for a monthly payment of $2,672.12, which matched the parties' reported home mortgage payment, but the monthly bill statement was simply that—a billing statement.

26

Further, plaintiff testified that she was a joint borrower on all the mortgages, and the judge found her testimony "credible," and "basically truthful."

First, as plaintiff explained, the parties divided their expenses based on the percentage of income they each earned, and as part of that agreement, defendant paid the mortgage. The judge determined plaintiff's testimony was "consistent[]" and "logical[]." Moreover, defendant's assertion that the loan for the solar panels amounted to a second mortgage in his name is also unsupported by the loan documents, which evidenced nothing more than a personal loan to defendant.

Second, the judge awarded plaintiff the former marital home but also required her to pay defendant his 50% share of its value with her equity in the parties' other real estate. The value of the marital home includes deduction for any outstanding mortgage. See Slutsky v. Slutsky, 451 N.J. Super. 332, 348 (App. Div. 2017) ("Where marital debts are proven, courts should deduct marital debts from the total value of the estate, or allocate the obligations between the parties."). Thus, as the judge properly observed, any mortgage owed by the parties for the home should either be satisfied at the time of transfer or placed in plaintiff's name as sole owner—a condition which she conceded at trial.

Third, the parties stipulated that they would each be responsible for debts in their separate names.

Finally, even if defendant was solely responsible for mortgage debt encumbering the home, that alone would not entitle him to retain the home. Rather, the decision would turn on the weight of the equitable distribution factors, one of which specifically instructs the judge to consider the needs of the PPR for purposes of child custody. N.J.S.A. 2A:34-23.1(l); see also Daly v. Daly, 179 N.J. Super. 344, 350 (App. Div. 1981) (noting that an "[u]nderlying" consideration in distributing the marital home is which parent will provide the primary housing for the minor children).

Here, the judge duly found that the factors weighed in favor of plaintiff's retaining the home, primarily because she would be the children's PPR for school purposes, and Spotswood had always been the children's home. Also, the judge found defendant had implicitly conceded that plaintiff would retain the former marital home because he obtained a $100,000.00 mortgage on the Sandford Street property with the intention of purchasing a separate home for himself. It was only after that deal fell through did he make a claim for the marital home. Thus, we discern no error or abuse of discretion on this issue.

A-1101-22

## C.

### Sandford Street and Lee Avenue

Defendant also argues the judge erred in finding Sandford Street and Lee Avenue were marital properties and in awarding plaintiff half of their values. With respect to Sandford Street, defendant claims that he alone purchased it from his parents in 1997, prior to the marriage, with a "gift" of equity from his parents. Defendant claims that: (1) the rental income from this property fully supported it; (2) marital funds were never used for this property; (3) the property was never intended to be a marital asset; (4) rents for this property were deposited into a separate account to which plaintiff had no access; (5) and the income and expenses for the property "were clearly delineated from the files on the joint tax returns."

Defendant contends the court erred in finding that Lee Avenue was marital property because his mother "originally acquired" that property and that Silver City Services—the company that he and his mother formed—ultimately had ownership of it. He contends that no marital funds supported this property and that his mother bought it back after losing it in a tax foreclosure. Defendant avers that plaintiff produced no documents to establish otherwise.

A-1101-22

The party claiming that property is separately owned, and thus immune from equitable distribution, bears the burden of proof. Landwehr, 111 N.J. at 504 (affirming the holding in Painter v. Painter, 65 N.J. 196, 214 (1974)). A court will presume that property acquired during the marriage is marital property subject to distribution. N.J.S.A. 2A:34-23.1 ("It shall be a rebuttable presumption that each party made a substantial financial or nonfinancial contribution to the acquisition of income and property while the party was married."). The equitable distribution statute "reflects a public policy that is 'at least in part an acknowledgment that marriage is a shared enterprise, a joint undertaking, that in many ways [] is akin to a partnership.'" Slutsky, 451 N.J. Super. at 358 (quoting Thieme v. Aucoin-Thieme, 227 N.J. 269, 284 (2016) and Smith v. Smith, 72 N.J. 350, 361 (1977)).

Here, the judge credited plaintiff's testimony that marital funds supported all the rental properties, noting that the parties had reported on their income tax returns that the rental properties operated at a loss and accepted plaintiff's testimony that marital funds compensated for the loss. In addition, the judge found that the rental income, combined with the parties' salaries, supported the marital lifestyle, and the $48,500.00 sum that defendant's mother loaned him to repurchase Lee Avenue had to be repaid to her estate.

Moreover, while defendant claimed that the rental properties were self-sufficient and the income generated from them was his alone, he provided no documents to support this claim. Accordingly, the judge's ruling on equitable distribution was supported by the evidence and not an abuse of discretion. We agree that defendant failed to sustain his burden of proof that these real properties were not subject to equitable distribution.

III.

A.

Custody and Parenting Time

Defendant argues that the judge erred in his custody determination by adopting plaintiff's parenting time schedule for the two minor children, in awarding child support based on that plan, and in failing to comply with Rule 5:8-6, which requires the judge to hold a custody hearing when custody is at issue and authorizes the judge to interview the children in deciding custody.

Defendant claims that while he and plaintiff agreed to share legal custody, her parenting time schedule resulted in the children spending more time with her, thus negating their "shared" agreement. He further asserts the judge failed to hold a custody hearing and failed to ask the children during their interviews about their preferred living arrangement. Defendant also argues the judge erred

in awarding $141.00 in weekly child support based on the "unfair parenting time schedule order."

In relevant part, Rule 5:8-6 provides:

> Where the court finds that the custody of children is a genuine and substantial issue, the court shall set a hearing date no later than six months after the last responsive pleading. The court may, in order to protect the best interests of the children, conduct the custody hearing in a family action prior to a final hearing of the entire family action. As part of the custody hearing, the court may on its own motion or at the request of a litigant conduct an in camera interview with the child(ren). In the absence of good cause, the decision to conduct an interview shall be made before trial. If the court elects not to conduct an interview, it shall place its reasons on the record. If the court elects to conduct an interview, it shall afford counsel the opportunity to submit questions for the court's use during the interview and shall place on the record its reasons for not asking any question thus submitted.

In determining child custody, the court must weigh the factors set forth in N.J.S.A. 9:2-4(c), with the ultimate concern being the best interests of the children. Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) (citing V.C. v. M.J.B., 163 N.J. 200, 227-28 (2000)).

N.J.S.A. 9:2-4(c) provides:

> In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept

32

custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.

In contested custody cases, the court "must reference the pertinent statutory criteria with some specificity." Kinsella v. Kinsella, 150 N.J. 276, 317 (1997). Appellate courts accord the judge's factual findings after a bench trial substantial deference when "'supported by adequate, substantial, credible evidence' in the record." Landers v. Landers, 444 N.J. Super. 315, 319 (App. Div. 2016) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). "We also note proper factfinding in divorce litigation involves the Family Part's 'special jurisdiction and expertise in family matters,' which often requires the exercise of reasoned discretion." Slutsky, 451 N.J. Super. at 344 (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

A-1101-22

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall, 222 N.J. at 428 (quoting Cesare, 154 N.J. at 412). But "[a]ll 'legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review.'" Slutsky, 451 N.J. Super. at 344-45 (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

We reject defendant's arguments that the judge abused his discretion on the issues of custody and parenting time. The judge addressed the N.J.S.A. 9:2-4(c) factors. The judge accepted the parties' testimony that they equally cared for the children in different ways. For example, plaintiff primarily cared for the children when they were younger, and she currently helped them with schoolwork and their nighttime routine.

Defendant was more involved with the children as they got older, especially with their sports, coaching some of the teams, and driving Ka.O. to school. Both parties prepared meals for the children. Plaintiff mostly handled their clothing needs. Plaintiff scheduled doctor appointments for the children, and defendant took them to the appointments. Plaintiff took a more active role in disciplining the children.

During the judge's interview of the children, neither "seemed upset" about the divorce. Both said they enjoyed spending time with each parent and discussed different activities they did with them. The judge found both parties had strong ties with their children, which would likely continue. The children conveyed that they were "comfortable with both" parties, relied on both parties, and were "happy in their home environment." The judge highlighted that he did not ask all questions that the parties had submitted for the interview but only asked those that were "helpful" in deciding custody.

The judge found no history of domestic abuse. While there was one incident when plaintiff struck defendant after he kept Ka.O. out late when she had to get up early for a lacrosse game the next morning, the judge said it "hardly" rose to the level of domestic violence.

The parenting plan plaintiff created provided "chunks" of time for each parent (214 or 59% of overnights with plaintiff and 148 overnights with defendant during days when he did not work), which she believed was important to accommodate the children's school schedule. The judge emphasized that the time plaintiff proposed the children spend with defendant was not during his twenty-four-hour shifts, which would permit him to "fully enjoy the time with

the children." Defendant, on the other hand, believed the children should move every two days between the parties' two homes.

The judge found that plaintiff's plan was in the children's best interests because it would provide them stability and a routine, which they needed during school, and it would allow them to remain in their home. In particular, the judge noted that plaintiff's employment as a teacher allowed her to be home after school and during the summer months. In contrast, defendant's employment as a firefighter required him to work twenty-four-hour shifts, giving him time with the children when he was not working. The judge underscored that in requesting a shared parenting time arrangement, defendant offered no specific explanation as to how that would work, particularly after considering his work schedule and the children's school and sports schedules. There exists substantial credible evidence in the record to support the judge's findings, including his credibility findings, and we discern no abuse of discretion.

We reject defendant's argument that the judge failed to comply with Rule 5:8-6. Here, the judge considered all of the relevant statutory factors and concluded that the best interests of the children would be served by plaintiff's proposed parenting schedule for the reasons stated. On this record, we discern

A-1101-22

no abuse of discretion and defer to the judge's findings on custody and parenting time.

B.

Child Support

Because defendant's child support argument is based exclusively on his contention that the parenting time schedule should be modified to a fifty-fifty schedule, it lacks merit and warrants no further discussion. R. 2:11-3(e)(1)(E). However, we address the child support award because the family's income exceeds $187,200.00.

Child support awards and modifications are left to the sound discretion of the trial court, and we are limited to determining whether there was an abuse of discretion. Innes v. Innes, 117 N.J. 496, 504 (1990); Raynor v. Raynor, 319 N.J. Super. 591, 605 (App. Div. 1999). "The trial court has substantial discretion in making a child support award." Tannen v. Tannen, 416 N.J. Super. 248, 278 (App. Div. 2010). A child support determination will not be set aside unless [shown to be] manifestly unreasonable, [unsupported by substantial evidence], or "'the result of whim or caprice.'" Ibid. A court must attach a Guidelines worksheet to its decision and also provide a statement of reasons for its decision. Fodero v. Fodero, 355 N.J. Super. 168, 170 (App. Div. 2002).

Rule 5:6A provides that the Guidelines "shall be applied in an application to establish child support" and may only be modified for good cause shown. Where the family income exceeds $187,200.00, "the court shall apply the [G]uidelines up to $187,200.00 and supplement the [G]uidelines-based award with a discretionary amount based on the remaining family income" together with the factors specified in N.J.S.A. 2A:34-23. Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A (2025), www.gannlaw.com. See also Isaacson v. Isaacson, 348 N.J. Super. 560, 581 (App. Div. 2002) (the "maximum amount provided for in the [G]uidelines should be 'supplemented' by an additional award determined through application of the statutory factors set forth in N.J.S.A. 2A:34-23(a)").

Pursuant to N.J.S.A. 2A:34-23(a), in determining the amount to be paid by a parent for support of the child or children and the period during which the support is owed, the court in those cases not governed by court rule shall consider, but not be limited to, the following factors:

(1) Needs of the child;

(2) Standard of living and economic circumstances of each parent;

(3) All sources of income and assets of each parent;

(4) Earning ability of each parent, including educational background, training, employment skills, work experience, custodial responsibility for children including the cost of providing childcare and the length of time and cost of each parent to obtain training or experience for appropriate employment;

(5) Need and capacity of the child for education, including higher education;

(6) Age and health of the child and each parent;

(7) Income, assets and earning ability of the child;

(8) Responsibility of the parents for the court-ordered support of others;

(9) Reasonable debts and liabilities of each child and parent; and

(10) Any other factors the court may deem relevant.

Nevertheless, it is well within the judge's discretion to determine "the choice of the methodology to employ in arriving at a child support award when the total income of the parties exceeds the [g]uidelines," recognizing that the "goal is to calculate a child support award that is in the best interest of the child after giving due consideration to the statutory factors and the [G]uidelines." Caplan v. Caplan, 182 N.J. 250, 272 (2005).

In Caplan v. Caplan, 364 N.J. Super. 68, 86-90 (App. Div. 2003), we set forth a detailed process for determining child support in high-income families:

First, the reasonable needs of the children must be determined. . . .

. . . .

Second, because there must be a fair and appropriate allocation of the children's needs between the parties, the ability of the parties to generate earned income, in addition to unearned income, must be determined.

. . . .

Third, upon determining the respective percentage of each party's net imputed earned and unearned income of their total combined net imputed earned and unearned income, those percentages shall be applied to determine each party's share of the maximum basic child support guideline award for two children.

. . . .

Fourth, the maximum basic child support amount . . . should be subtracted from the court-determined reasonable needs of the children to determine the remaining children's needs to be allocated between the parties. Then, the court must analyze the factors outlined in N.J.S.A. 2A:34-23(a) and determine each party's responsibility for satisfying those remaining needs.

In the matter under review, the judge ordered defendant to pay plaintiff $141.00 per week in child support, and for both parties to maintain life insurance as currently existed to support that obligation. The judge also ordered each party

to pay 50% of the children's unreimbursed medical expenses, and extracurricular activities.

The judge erred and abused his discretion in awarding alimony to plaintiff as stated using only $110,000.00 for defendant's income when the income tax returns showed higher amounts for the reasons we next address regarding open durational alimony. Consequently, the child support award was mistakenly calculated.

Moreover, the judge did not conduct an analysis of the N.J.S.A. 2A:34-23(a) factors. Accordingly, on remand, the judge shall make findings under N.J.S.A. 2A:34-23(a) and determine whether a supplemental award in light of the parties' earnings is warranted. We leave it to the judge's discretion whether a hearing on this issue is needed.

IV.

Open Durational Alimony

Next, defendant contends the open durational alimony award is erroneous, and the judge abused his discretion because: (1) the judge failed to impute income to plaintiff on the basis she could have worked as a supervisor and earn additional income during the summer months; and (2) the judge improvidently

41

found that defendant had unreported rental income, which increased his income beyond the amount he disclosed.

In her cross-appeal, plaintiff argues the judge erred and abused his discretion because: (1) defendant's income was reported as $125,417.00 and $133,000.00 on his 2020 and 2021 federal income tax returns, amounts significantly higher than the $110,000.00 income figure used by the judge; and (2) the $500.00 monthly alimony award is too low and should be recalculated using defendant's reported yearly incomes in 2020 and 2021.

"The award of spousal support is broadly discretionary." Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004), aff'd as modified, 183 N.J. 290 (2005). The court may order alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable and just." N.J.S.A. 2A:34-23. "[A]limony is neither a punishment for the payor nor a reward for the payee." Mani v. Mani, 183 N.J. 70, 80 (2005).

"The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation." Innes, 117 N.J. at 503. "[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the

42

supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000).

Alimony awards are "governed by distinct, objective standards defined by the Legislature in N.J.S.A. 2A:34-23(b)." Gnall, 222 N.J. at 429. The court must consider the following statutory factors:

> (1) The actual need and ability of the parties to pay;
>
> (2) The duration of the marriage or civil union;
>
> (3) The age, physical and emotional health of the parties;
>
> (4) The standard of living established in the marriage or civil union and the likelihood that each party can maintain a reasonably comparable standard of living, with neither party having a greater entitlement to that standard of living than the other;
>
> (5) The earning capacities, educational levels, vocational skills, and employability of the parties;
>
> (6) The length of absence from the job market of the party seeking maintenance;
>
> (7) The parental responsibilities for the children;
>
> (8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;

43

(9) The history of the financial or non-financial contributions to the marriage or civil union by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment;

(13) The nature, amount, and length of pendente lite support paid, if any; and

(14) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23(b).]

The court must "make specific findings on the evidence about all of the statutory factors" listed above. N.J.S.A. 2A:34-23(c). "[F]ailure to consider all of the controlling legal principles requires a remand." Boardman v. Boardman, 314 N.J. Super. 340, 345 (1998). Here, in his opinion, the judge addressed each of the requisite statutory factors.

Where the court finds that a spouse is voluntarily underemployed, unemployed without just cause, or otherwise generating less income than could be earned, the court may impute income to the spouse. Tannen, 416 N.J. Super. at 262; see also Arribi v Arribi, 186 N.J. Super. 116, 118 (Ch. Div. 1982) (providing that "one cannot find himself in, and choose to remain in, a position where he has diminished or no earning capacity and expect to be relieved of or to be able to ignore the obligations of support to one's family.").

"Imputation of income is a discretionary matter not capable of precise or exact determination[,] but rather require[es] a trial judge to realistically appraise capacity to earn and job availability." Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015) (quoting Gnall v. Gnall, 432 N.J. Super. 129, 158, rev'd on other grounds, 222 N.J. 414 (2015); Storey v. Storey, 373 N.J. Super. 464, 474 (App. Div. 2004)).

The imputed income must be based on a "realistic[]" assessment of the party's earning ability in light of the party's education, past work experience, qualifications, prevailing job opportunities, and average earnings for the occupation based on department of labor statistics. Elrom, 439 N.J. Super. at 435-46 (applying to an alimony determination the standard for imputing income when determining child support). Central to the inquiry is whether one spouse

is failing to fulfill "the obligation to deal fairly" with the other in terms of contribution to the marital lifestyle. Tannen, 416 N.J. Super. at 262-63 (discussing Kay v. Kay, 405 N.J. Super. 278, 285 (App. Div. 2009)).

The court's decision to impute income to a spouse is a discretionary one that will not be disturbed on appeal "absent a finding the judge's decision rested on an impermissible basis, considered irrelevant or inappropriate factors, . . . failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Elrom, 439 N.J. Super. at 434 (internal quotations omitted). "Consequently, when a reviewing court concludes there is satisfactory evidentiary support for the trial court's findings, its task is complete and it should not disturb the result . . . ." Id. at 433 (internal quotations omitted).

In the matter under review, the judge found that plaintiff testified truthfully to her monthly income and expenses, as reflected on her CIS, while defendant did not. Defendant not only failed to provide specific amounts on his CIS for his expenses, but also failed to include any rental income.

With respect to the alimony factors, the judge found that the marriage was long-term, lasting over twenty years, and thus subject to open durational alimony. The judge determined that the parties enjoyed a middle-class lifestyle

during the marriage, and both would be able to maintain that standard "as supplemented."

As a teacher, plaintiff earned $95,853.00 per year, while defendant earned $110,000.00 as a firefighter. Defendant claimed that plaintiff should return to the higher paying supervisory position she held from 2010 to 2013 and work summers to earn additional income, but the judge found his position unjustified. The judge credited plaintiff's reasons for leaving the supervisory position were "reasonable and believable" and that requiring her to work during the summers to supplement her income was "not warranted." Thus, the judge found no basis to impute income to her.

Both parties were equally involved with the children and would share custody of them. And, both parties equally contributed to the marriage and the accumulation of assets during the marriage. Neither party had plans of ending their employment in the near future. The equitable distribution award provided for the equal distribution of assets.

The court concluded that plaintiff was entitled to $500.00 per month in open durational alimony, placing emphasis on "the parties' incomes" and the "unaccounted for rental incomes" defendant had been receiving.

A-1101-22

On appeal, defendant contends the alimony award was erroneous because the judge should have imputed income to plaintiff and erroneously found that he had failed to report rental income. In her cross-appeal, plaintiff contends that the judge should have awarded her more than $500.00 monthly alimony because contrary to the judge's finding that defendant earned $110,000.00 yearly income as a firefighter, defendant had yearly incomes of $125,417.00 and $133,000.00 in 2020 and 2021, respectively.

We first address defendant's argument. The judge did not abuse his discretion in declining to impute income to plaintiff. The uncontroverted evidence showed she had not worked as a supervisor since 2013, and when she held that position, it was only for a three-year period. As plaintiff credibly testified, she left the position because it took too much time away from the family and she did not believe the additional pay was worth the additional time she had to devote to the job. The judge found her explanation reasonable and truthful. We defer to the judge's findings, which are supported by substantial credible evidence in the record.

Moreover, plaintiff has not violated her duty to deal fairly with defendant in terms of contribution to the marital lifestyle, since she continues to work full-time as a teacher. See Tannen, 416 N.J. Super. at 262-63 (discussing divorcing

48

spouse's obligation to deal fairly with one another in terms of earning income). Plaintiff always earned less than defendant. She has no obligation to seek other employment, or have income imputed to her, to benefit defendant. Id. at 263 ("Certainly no reported decision in this State has ever characterized each party's obligation to the other in a divorce proceeding as a 'fiduciary duty,' the essence of which is 'to act primarily for another's benefit.'").

Defendant's claim that he did not fail to disclose rental income is not supported by anything in the record, except his own self-serving testimony. He produced no records or evidence to corroborate his testimony. Thus, the judge was free to reject his testimony, and we are satisfied nothing in the record suggests that rejection amounted to an abuse of discretion.

With respect to plaintiff's cross-appeal that the judge erred in finding that defendant's income as a firefighter was only $110,000 per year, her argument has merit. In 2020, defendant's W-2 showed gross income from his employment as a firefighter was $125,417.00, and in 2021, that amount increased to $133,313.00. The judge gave no reason why he used the $110,000.00 amount for defendant's income when his 2020 and 2021 W-2 forms showed greater amounts, and the judge issued the alimony award in November 2022.

For these reasons, we agree the judge misapplied his discretion in calculating the alimony award requiring remand to address that issue.

V.

Status Quo Post DJOD

Defendant contends the court erred in failing to order the parties to maintain the status quo post DJOD, pending complete distribution of the parties' assets. In particular, defendant claims that the judge should not have ordered his alimony and child support payments to begin until after he moved out of the marital home and stopped paying his share of expenses associated with the home. Defendant claims that he could not move out until the other assets were sold and plaintiff paid him his share of the home.

Plaintiff counters that defendant's challenge is based on a self-created problem. She contends that she is fully prepared to pay all expenses associated with the marital home once defendant moves out and that his refusal to leave does not render the judge's decision erroneous. We agree.

Pursuant to Rule 5:7-4A, support obligations must be paid immediately upon entry of final judgment with the limited exception that, for good cause, the court may modify the time for payment to begin. In relevant part, the Rule instructs:

A-1101-22

(a) Immediate Income Withholding. All orders that include child support shall be paid through immediate income withholding from the obligor's current and future income, unless the parties agree in writing to an alternative arrangement, or either party shows and the court finds good cause for an alternative arrangement. If included in the same order as child support, the court may, in its discretion, garnish a separate amount for alimony, maintenance or spousal support, in accordance with N.J.S.A. 2A:17-50[] and include such amount in the immediate income withholding order.

. . . .

(2) Procedure. If an order or judgment contains a child support provision, the child support shall be paid through immediate income withholding and the withholding may include amounts for alimony, maintenance or spousal support, unless the parties agree, in writing, to an alternative arrangement or either party shows and the court finds good cause for an alternative arrangement. The court shall forward the order to the Probation Division which shall prepare and send a Notice to Payor of Income Withholding to the obligor's employer or other source of income.

[Rule 5:7-4A(a).]

Here, the judge ordered support payments to begin on November 1, 2022, the date of the DJOD. Defendant's contention that he should not have been required to pay support until after all the properties were sold as those sales were necessary for plaintiff to pay him his equitable share of the former marital home, is baseless, and we discern no error.

51

VI.

Counsel Fees

Finally, in her cross-appeal, plaintiff contends the judge erred in denying her request for counsel fees. An award of attorney's fees in a matrimonial action rests in the discretion of the Family Part judge. R. 5:3-5(c); Tannen, 416 N.J. Super. at 285 (citing Eaton v. Grau, 368 N.J. Super. 215, 225 (App. Div. 2004)). On appeal, the Family Part judge's decision regarding attorney's fees will be upheld absent a showing of abuse of discretion. Ibid.

In deciding whether to award attorney's fees, the judge should consider:

> (1) the financial circumstances of the parties;
>
> (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party;
>
> (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial;
>
> (4) the extent of the fees incurred by both parties;
>
> (5) any fees previously awarded;
>
> (6) the amount of fees previously paid to counsel by each party;
>
> (7) the results obtained;
>
> (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and

(9) any other factor bearing on the fairness of an award.

[R. 5:3-5(c).]

Here, the judge did not fully explain his reasons for rejecting both parties' counsel fee requests consistent with these factors. The record only shows the judge recognized plaintiff paid $41,185.00 in fees and defendant paid $42,415.00. The judge stated each party could pay their own fees, and neither acted in bad faith, but rather used a mediator to resolve certain issues.

Because we are remanding for reconsideration of the alimony and child support issues, the judge shall consider the counsel fee issue anew, taking into consideration the Rule 5:3-5(c) factors.

Affirmed in part, reversed and vacated in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

53